*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* C. C. KEERL, Minor.

UNPUBLISHED
January 23, 2020

No. 349384
Oakland Circuit Court
Family Division
LC No. 17-853574-NA

Before: METER, P.J., and FORT HOOD and REDFORD, JJ.

PER CURIAM.

Respondent, the father of CCK, appeals as of right the trial court's order terminating his parental rights under MCL 712A.19b(3)(g) (parent failed to provide proper care or custody and no reasonable expectation parent will provide proper care or custody within a reasonable time), and (j) (reasonable likelihood child will be harmed if returned to the parent's home).[1] We affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

CCK was born with congenital medical problems, including DiGeorge syndrome and tetralogy of fallot. As a consequence of those diagnoses, CCK suffered from a wide array of different issues, including asthma, an aortopulmonary collateral vessel, developmental delay, gastroesophageal reflux disease (GERD), hypocalcemia, lazy eye, seizures, prior stroke, subglottic stenosis, tetralogy of fallot with pulmonary atresia, tracheobronchomalacia, hearing loss, and submucous cleft palate. Before he turned five years old, he had undergone more than 10 surgeries. CCK had at least 10 specialists at the University of Michigan Health System (UMHS) in Ann Arbor, who he saw one to two times per month. He also had a primary care physician, saw a behavioral therapist, was in special education at school, and participated in physical, occupational, and speech therapy. In short, CCK's care was intensive and constant.

---

[1] In this case, the trial court also terminated the parental rights of an unknown father to CCK's sister, IP. CCK and IP shared a mother whose death precipitated this case. The termination with respect to IP is not a part of this appeal.

In 2013, respondent divorced CCK's mother, and became significantly less involved in CCK's care. At the end of 2016, CCK's mother's health began declining—she also was born with DiGeorge syndrome and a heart condition. In response, her care for CCK fell behind, and she engaged in physical and emotional abuse. Respondent either was not aware of the problems or refused to act. Eventually, CCK's mother succumbed to her ailments and died in April 2017. CCK was left alone overnight with his child sister and his mother's corpse. After that incident and the abuse at his mother's hands, CCK was diagnosed with posttraumatic stress disorder (PTSD).

CCK was placed with a friend of his mother's while child protective services (CPS) attempted to find respondent. When they were unable to do so, they filed a petition for temporary custody. The petition alleged that respondent could not be found, had not seen CCK in 18 months, and had over $4,000 in child-support arrearages. Respondent eventually came to court and pleaded *nolo contendere* to the allegations in the petition, establishing jurisdiction. During the dispositional phase of the case, respondent was either noncompliant or inconsistent with his parent agency agreement (PAA). Eventually, the Department of Health and Human Services (DHHS) sought termination under subsections (c)(*i*), (g), and (j). After a lengthy, bifurcated termination hearing, the trial court terminated respondent's parental rights to CCK under subsections (g) and (j), finding that DHHS had not established that termination was warranted under subsection (c)(*i*). The trial court primarily relied on respondent's lack of involvement in CCK's medical care and education, failure to comply with the PAA, and inability to show that he could properly meet the significant needs of CCK. This appeal followed.

## II. STATUTORY GROUNDS

Respondent first argues that the trial court clearly erred in finding that clear and convincing evidence supports termination under subsections (g) and (j). Respondent also argues that the trial court's findings of fact and conclusions of law regarding subsection (g) were legally insufficient. We disagree on both accounts.

## A. PRESERVATION AND STANDARD OF REVIEW

"[I]ssues that are raised, addressed, and decided by the trial court are preserved for appeal." *In re TK*, 306 Mich App 698, 703; 859 NW2d 208 (2014). The issue of whether petitioner established statutory grounds for termination of parental rights is always at issue in termination cases. This issue was raised in the termination hearing, the trial court addressed and decided the issue when it issued its opinion both orally and in a written order on statutory grounds, and therefore, this issue is preserved for appeal. *Id*. As to the specific issue of whether the trial court made adequate factual findings and conclusions of law, such an argument required a specific objection for preservation. *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011). The record is clear that respondent did not object to the form of the trial court's opinion and order regarding statutory grounds. Thus, this issue is not preserved for review. *Id*.

For the preserved issue, "[t]his Court reviews for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination." *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014). "The trial court's factual findings are clearly erroneous if the evidence supports them, but we are definitely and firmly convinced that it made

a mistake." *Id*. at 709-710. As to the unpreserved issue of whether the trial court made adequate findings of fact and conclusion of law on the record, our "review is [] limited to plain error affecting substantial rights." *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *VanDalen*, 293 Mich App at 135 (quotation marks and citations omitted).

### B. SUBSECTION (g)

" 'To terminate parental rights, a trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence.' " *In re Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 635; 853 NW2d 459 (2014), quoting *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). The trial court found clear and convincing evidence to terminate respondent's parental rights under MCL 712A.19b(3)(g).[2] Respondent's parental rights were properly terminated if the trial court found, by clear and convincing evidence, that "[t]he parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." MCL 712A.19b(3)(g). "A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *White*, 303 Mich App at 710.

We first address respondent's unpreserved argument that the trial court's findings of fact and conclusions of law regarding subsection (g) were legally insufficient. Under MCR 3.977(I)(1), the trial court was required to "state on the record or in writing its findings of fact and conclusions of law." The court rule also provides that, "[b]rief, definite, and pertinent findings and conclusions on contested matters are sufficient." *Id*. Here, respondent only challenges the trial court's findings of fact regarding one portion of subsection (g), specifically, the portion requiring a finding that respondent was "financially able to . . . provide proper care or custody for" CCK. MCL 712A.19b(3)(g). Respondent contends that the trial court erroneously found that he *was* financially able to care for CCK, as opposed to the required finding that he *was not* able to do so. The lack of merit in the argument, as argued by DHHS, is almost immediately apparent. Subsection (g) does not require the trial court to find clear and convincing evidence that respondent is financially *un*able to care for CCK, but that he was financially *able* to do so, and did not. The clear intent of the statute is to ensure that the trial court is not terminating respondent's parental rights because he is poor. Thus, the trial court's finding that respondent was financially able to provide for the care or custody for CCK was not improper or legally insufficient under MCR 3.977(I)(1).

Next, respondent also argues that the trial court clearly erred in finding that statutory grounds for termination under subsection (g) were established by clear and convincing evidence. Respondent once again repeats the argument regarding the financial ability to care for CCK, which is without merit for the reasons already discussed. Respondent then argues that there was

---

[2] Subsection (g) was amended effective June 12, 2018. See 2018 PA 58.

also proof that he could and would provide for proper care or custody of CCK. The record reveals the opposite. Specifically, at the time of termination, CCK had been in foster care for nearly two years, and respondent had been receiving services from DHHS since July 2017. In that time, respondent had only partially complied with his PAA. Specifically, his PAA required that he engage in counseling, and he only intermittently did so, and usually only around times when hearings were about to occur. The PAA also required that respondent provide proof of income and to obtain and provide proof of housing. At the time of the termination hearing, respondent had not provided any paystubs in months, had not had his new home approved by DHHS, and had not provided a written lease as required by DHHS. Additionally, respondent's PAA required that he engage in and benefit from parenting classes. While he obtained a certificate of completion for the parenting classes, he failed to show any benefit from those classes. In short, even after completing the course, respondent continued to miss CCK's nonsurgical medical appointments, parent-teacher conferences, scheduled telephone calls, and individualized education program (IEP) meetings. Had respondent benefited from the course, he would have realized that his involvement in all of those things was necessary to ensure that CCK had a safe, stable, and secure home environment to which to return.

Instead, respondent's actions provided no assurance that he would be able to provide the care and custody that CCK needed, as established in the trauma assessment conducted by Easter Seals. As additional evidence of respondent's inability to properly care for CCK, he did not complete his portion of the trauma assessment for CCK. Thus, in addition to failing to comply and benefit from his PAA, which is evidence of an inability to provide proper care or custody of CCK, respondent also showed a blatant disregard for CCK's wellbeing. *White*, 303 Mich App at 710. Respondent was provided nearly two years of services from DHHS, including reminders about CCK's medical appointments, parent-teacher conferences, and IEP meetings. In the event he attended any of those things at all, he only attended on an intermittent basis. Moreover, respondent was most compliant when under the imminent threat of a hearing to terminate his parental rights. If that threat were to be removed, there was no evidence on the record that respondent would maintain proper care or custody of CCK. Further, there was no evidence that respondent was on the path to improving on those skills. Rather, at the time of termination, the evidence fully supported the trial court's determination that respondent would not be able to provide proper care or custody for CCK in a reasonable time. Thus, the trial court did not clearly err in finding that termination of respondent's parental rights was warranted under subsection (g). *Brown/Kindle/Muhammad Minors*, 305 Mich App at 635; *White*, 303 Mich App at 710.

## C. SUBSECTION (j)

Although we need not consider the remaining statutory ground for termination, because clear and convincing evidence of one ground is sufficient, see *Brown/Kindle/Muhammad Minors*, 305 Mich App at 635, we will briefly address subsection (j).

As noted, the trial court also found that MCL 712A.19b(3)(j) was a statutory ground for termination of respondent's parental rights. That decision by the trial court was not clearly erroneous if there was clear and convincing evidence that "[t]here [was] a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." MCL 712A.19b(3)(j). "[A] parent's failure to comply with

-4-

the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *White*, 303 Mich App at 711.

As noted by the trial court, it is important to consider CCK's mental and physical disabilities when considering subsection (j). CCK's medical history reflects a laundry list of medical maladies, including DiGeorge syndrome, tetralogy of fallot, PTSD, and cognitive impairment. CCK has a developmental delay, an IEP at school, and a recorded intelligence quotient (IQ) of 55, at its highest. His trauma assessment indicated that the most important thing for his mental health was a structured and stable environment. Further, there was testimony that, without regular and timely medical care, CCK's manageable maladies could become life threatening.

Despite having knowledge of all of these issues, respondent never attended CCK's nonsurgical medical appointments, never attended CCK's IEP meetings, and only once attended a parent-teacher conference with CCK's special education teacher. After that parent-teacher conference, respondent did not have any contact at all with the special education teacher until nearly one year later. Despite completing parenting classes, respondent's failure to engage in all of CCK's other services resulted in respondent lacking appropriate skills to care for CCK. The foster care worker testified about respondent's parenting issues, noting that he sometimes reinforced CCK's inappropriate behaviors, and questioned the logic of certain tools used with CCK. At other times, respondent displayed an inability to recognize signs and symptoms that suggested CCK might be verging on more serious issues. Respondent also jeopardized CCK's health when he delayed giving consent to certain surgical procedures that had been recommended by CCK's specialists. Instead of speaking to those doctors, respondent performed Internet research on the proposed surgeries. While it was not inappropriate for respondent to be fully informed regarding the medical procedures CCK was subject to, it was not appropriate to delay that research until a few days before surgery. In addition to potentially delaying medical care desperately needed by CCK, it also caused tumult in his life, when he needed structure and stability. There is no evidence to suggest that absent DHHS's unrelenting pressure to provide the consent for certain medical procedures, that it would have ever been provided.

In short, the evidence admitted throughout the case showed that respondent was either unwilling or unable to fully comprehend and appreciate the seriousness of CCK's physical and mental issues. Thus, if CCK was returned to respondent's care, it was very likely that he would suffer harm, either emotionally from the tumult caused by respondent's unstructured and unstable lifestyle, or physically because of respondent's failure to identify and appreciate significant medical problems. This likelihood of harm was also supported by respondent's failure to comply with and benefit from his PAA, as already discussed. *White*, 303 Mich App at 711. Consequently, the trial court did not clearly err in finding that termination of respondent's parental rights to CCK was warranted under MCL 712A.19b(3)(j). *Brown/Kindle/Muhammad Minors*, 305 Mich App at 635.

### III. BEST INTERESTS

Respondent also argues that the trial court clearly erred in finding that the preponderance of the evidence supported that termination of his parental rights was in the best interests of CCK. We disagree.

## A. STANDARD OF REVIEW

We review a trial court's determination regarding best interests for clear error. *White*, 303 Mich App at 713. "A trial court's decision is clearly erroneous 'if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.' " *In re Olive/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012) (brackets omitted), quoting *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

## B. LAW AND ANALYSIS

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014), citing MCL 712A.19b(5). " 'The focus at the best-interest stage has always been on the child, not the parent.' " *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App 49, 63; 874 NW2d 205 (2015) (brackets omitted), quoting *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). "Best interests are determined on the basis of the preponderance of the evidence." *LaFrance*, 306 Mich App at 733. In considering the issue of whether termination is in the best interest of the minor child, the trial court is permitted to consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, [] the advantages of a foster home over the parent's home . . . the length of time the child was in care, the likelihood that the child could be returned to her parents' home within the foreseeable future, if at all, and compliance with the case service plan." *Payne/Pumphrey/Fortson Minors*, 311 Mich App at 63-64 (citations and quotation marks omitted).

Respondent argues that the trial court clearly erred in finding that the preponderance of the evidence supported a finding that terminating his parental rights was in CCK's best interests. In making that decision, the trial court first relied on respondent's failure to attend CCK's nonsurgical medical appointments. Respondent argues that the trial court failed to consider that he would attend those appointments if he could schedule them around his schedule, that he did attend some appointments, and that he had familial support. The record shows that, from the time respondent began receiving services until the time of termination, he had missed 27 nonsurgical specialty appointments. In August 2018, as a last resort for reunification, the foster care worker and a DHHS permanency resource monitor met with respondent to discuss his barriers to attending those appointments. According to both, respondent's only request was that he be given two weeks' notice. In other words, he never stated that the scheduling of the appointments was the true problem. Even at the termination hearing, respondent testified that, if provided sufficient notice, he would be able to take time off of work. Testimony from the foster care worker and CCK's foster mother established that notice of CCK's nonsurgical medical appointment were provided months in advance; respondent stated he only needed two weeks' notice.

Moreover, there was no evidence presented that, throughout the history of the case, when respondent repeatedly missed such appointments, that he did not have familial support. Therefore, respondent's arguments that the trial court failed to consider that he would attend the appointments when able to schedule them himself, and with familial support, has no merit.

Respondent had familial support at the time and never reported that being able to schedule the appointments around his schedule was an issue during the proceedings. Thus, the trial court did not clearly err in finding that respondent's issues with attending appointments would continue if CCK was returned to respondent's care. *Olive/Metts Minors*, 297 Mich App at 41.

Additionally, respondent's argument that the trial court did not adequately account for the fact that he attended some medical appointments is similarly without merit. There is no indication in the trial court's decision that it did not consider respondent's intermittent attendance at certain counseling and surgical appointments. Rather, the trial court relied on the fact that, given CCK's significant mental and physical maladies, respondent's consistent attendance at *all* of CCK's medical appointments was necessary. Respondent's decision to attend a few appointments when he decides he wants to could prove to be fatal to CCK if no other party was ultimately responsible for CCK's health. Additionally, the trial court also noted that CCK's foster mother, who intended to adopt him, had attended all of the appointments, and she testified that she received special instructions regarding caring for CCK at those appointments. At the best-interests phase of the termination proceedings, the court was permitted to compare respondent's parenting to the foster mother's. *Payne/Pumphrey/Fortson Minors*, 311 Mich App at 63-64. Thus, the trial court appropriately considered that the foster mother was better prepared to care for CCK's needs, considering her consistent and constant attendance at CCK's medical appointments, as opposed to respondent's apparent indifference. *Id*.

Next, respondent argues that the trial court failed to appropriately consider respondent's plan to transfer CCK's medical care closer to home, at UMHS in Flint. Contrary to that argument, the trial court did consider that fact, but did so in a negative manner. This was not clearly erroneous, because respondent's testimony established that he had apparently decided to uproot CCK from all of his specialists in Ann Arbor and begin with new doctors in Flint, without knowing the names of any of the doctors in Flint or speaking with any of CCK's current specialists. Indeed, respondent was not even aware whether UMHS in Flint is a hospital or a doctor's office, and could not name the specialties of the doctors in Flint. The trial court did not clearly err in finding that respondent's decision making in that regard was a significant error and not a positive indicator of respondent's future ability to care for CCK. *Id*. That error in judgment also belies respondent's other argument on appeal that he is knowledgeable regarding CCK's maladies and prepared to care for him. If respondent was as knowledgeable as he claimed, he would know the importance of not uprooting CCK from his specialists without performing adequate research.

Even so, respondent fails to explain how moving the appointments closer to his home would be beneficial, when respondent repeatedly informed DHHS that transportation and his work schedule were not problematic to attending appointments in Ann Arbor. Stated differently, it was clear from the record that respondent was not attending CCK's medical appointments for other reasons besides proximity and convenience, and thus, fixing those problems would not remedy the true issue. In sum, the trial court's decision in regard to CCK's medical care was not clearly erroneous. *Id*.

Respondent also argues that the trial court failed to consider that he had an appropriate home with a bedroom furnished for CCK. The record reveals, however, that as of the date of

termination, despite having moved to that new home about six months beforehand, respondent still had not scheduled DHHS to perform a home inspection and verify the appropriateness of the location. Thus, it was not clearly erroneous for the trial court to refuse to give significant weight to respondent's claim that his house was appropriate and ready for CCK. *Id*.

Lastly, respondent argues that the trial court erred by failing to consider that he researched special education programs that would be available to CCK if he was placed with respondent. Instead, the trial court relied heavily on the fact that CCK was doing well in his current school, which provided a wide variety of services for him. Importantly, his school kept CCK with the same special education teacher through fifth grade—a teacher with whom CCK had shown great improvement since the commencement of the case. Rather than relying on respondent's unsupported conjecture that he had found a school that provided highly-regarded special education services and that a receptionist at the school promised they would accept CCK, the trial court considered the more likely possibility that CCK would end up in the public school system where respondent lived. As acknowledged by respondent and the foster care worker, that public school system's special education program was not comparable to that of CCK's current school. Given the lack of any actual, concrete evidence that special education program found by respondent was appropriate and available, the trial court did not clearly err in comparing the public school's special education program with CCK's current school. Moreover, the trial court appropriately considered that the foster mother was consistently involved in CCK's education and that he would stay with the same teacher and similarly-aged students. It was not clearly erroneous to find that removing CCK from that situation would not be in his best interests. *Payne/Pumphrey/Fortson Minors*, 311 Mich App at 63-64.

Although not argued by respondent, there also was evidence produced that CCK had a stronger bond with his foster mother, she was better prepared to care for all of CCK's needs, he would be adopted with his sister, and the foster mother provided a stable and structured environment for CCK. The foster mother was aware of CCK's medical issues, his emotional problems, the skills needed to remedy his behavioral issues, and his educational needs. She also had shown over the course of two years that she was able to perform all of the necessary duties involved with caring for a child with CCK's significant needs. Respondent, simply, had not done so. Therefore, the trial court did not clearly err in finding that it was in CCK's best interests to terminate respondent's parental rights. *Id*.

Affirmed.

/s/ Patrick M. Meter
/s/ Karen M. Fort Hood
/s/ James Robert Redford